UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA,

                          **REPORT AND RECOMMENDATION**

     - v -

                          CR-07-729 (SJ)(VVP)

LINCOLN GRANT,

                    Defendant.
-------------------------------------------------------------x

The defendant in this gun-possession case has moved to suppress the weapon whose possession provides the basis for the charge the defendant faces, and Judge Johnson has referred the motion to me for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). The defendant contends that the police officers who found the weapon in his possession did not have reasonable suspicion to stop him during the encounter that led to the warrantless seizure of the weapon. The court has received and reviewed papers submitted by the parties, and held an evidentiary hearing on January 18, 2008 at which the government offered the testimony of the arresting officer, as well as several photographs and the weapon that was seized. The defendant produced no evidence.[1] For the reasons below, I recommend that the motion be denied.

## FINDINGS OF FACT

The evidence adduced at the hearing established the following facts. On August 30, 2007, Officer Joseph Seminara was riding in an unmarked patrol car driven by his supervisor Lieutenant Ortlieb. They were accompanied by Captain Lewis, the executive officer of the 67th

---

[1] At the close of the government's evidence the defendant asked that the hearing be adjourned to permit him to obtain testimony from other police officers who were at the scene of the events in question. As the defendant and his counsel were well aware of the presence of the other officers both from the defendant's own involvement in the events and from the papers filed by the government on December 21, 2007, they had ample time to consider whether to summon those officers for testimony. Moreover, nothing in the evidence adduced by the government was a surprise or deviated from the detailed exposition of the anticipated proof which was set forth in the government's memorandum. Accordingly, the motion to adjourn was denied.

Precinct in Brooklyn where Seminara was assigned. Seminara and Ortlieb serve on the 67th Precinct Anticrime Unit, which focuses on violent street crimes and in particular illegal handguns. The 67th Precinct leads the city in arrests involving illegal handguns.

As they approached the Flatbush Gardens housing complex that evening at around 11:00 p.m., Seminara heard gunshots coming from the courtyard of the complex. All three officers immediately alighted from the patrol car and entered the courtyard from Foster Street, the street where they had double-parked their car. The courtyard extends from one end of the complex to the other, much like an alley, and connects several smaller courtyards formed by the various buildings that make up the complex. The officers walked quickly the complete length of the courtyard, but observed no one. At the end of the courtyard, they entered one of the six-story buildings that make up the complex, and climbed to the roof where each of the officers took an observation point to survey the courtyard below. The building they entered was on the left side of the courtyard. Seminara took up a position from which he was looking toward the front entrance of the building directly across the courtyard from the building where the officers were stationed. The address of the building toward which Seminara was facing was 1412 New York Avenue. Photographs of the courtyard offered in evidence disclose that the area under observation by Seminara was adequately illuminated by a number of lights affixed to the outside of the buildings.

While watching from the roof, Seminara saw an individual later identified as the defendant Lincoln Grant emerge from the front entrance of 1412 New York Avenue. Grant was wearing mesh basketball shorts and a white T-shirt. The T-shirt was not tucked into the waistband of the shorts, but rather extended a short distance below the waistband. As Grant

descended the several steps that led from the small porch just outside doorway, Seminara observed him grab something in his waistband to hold it in place and prevent it from falling out. Where Grant was clutching his waistband, Seminara saw a horizontal bulge just above the waistband, outlined by Grant's T-shirt, in the middle of Grant's torso at the approximate area of his belly button. After descending the steps, Grant proceeded along the walkway from the building hugging a fence alongside one wall of the building from which he had emerged. At this point Grant was walking directly toward the building atop which Seminara stood. As Grant approached the end of the fence, he stopped and leaned forward to peer around the corner of the building to his right. While doing so, he again clutched at his waistband in the same manner he had done while descending the steps. Seeing no one, Grant turned to his left and walked out of Seminara's sight toward Foster Street, the direction from which Seminara and his fellow officers had earlier come through the courtyard. Within a minute or two, Grant came back into Seminara's sight, this time peering around the corner of the building atop which Seminara was stationed. Grant then walked back into 1412 New York Avenue.

A short time later, Grant again emerged from 1412 New York Avenue and walked down the steps again clutching at his waistband. He repeated his previous routine, walking along the fence and peering around the corner, then proceeding out of Seminara's view toward Foster Street. Seminara and his fellow officers promptly walked down from the roof and out into the courtyard. With Seminara in the lead, they too walked through the courtyard toward Foster Street. As he was walking Seminara observed several younger kids with bikes congregated around one of the benches in the courtyard ahead of him.

As the officers were approaching the area where the kids were gathered, Seminara saw Grant walking directly towards him from the opposite direction about twenty feet away. Grant was looking down at the time, and Seminara again saw the horizontal bulge at the center of Grant's waistband that he had observed earlier. When Grant looked up and made eye contact with Seminara, he stopped and took a step backward. While taking the step he adjusted the bulge in his waistband toward the right side of his body using his right hand, grasping the bulge through his T-shirt. As Grant was adjusting the object in his waistband, Seminara was able to see a vertical piece apparently connected to the horizontal bulge moving underneath the clothing, and concluded that the bulge beneath Grant's clothing was a gun.[2] After adjusting the object, Grant turned to the kids, who were on his left, and began speaking with them.

Seminara approached Grant, identified himself and asked Grant if he had heard the gunshots. At this point, Seminara and Grant were approximately two feet apart. While answering that he had indeed heard the shots, Grant appeared to be nervous and made a motion toward the bulge in his waist band. Seminara immediately reached out and placed his hand on the bulge before Grant's hand got to it. As soon as he felt the object, which was hard, and ascertained that it was indeed a firearm, he uttered a code word to his lieutenant which indicated that Grant was armed. The lieutenant grabbed Grant's arms, Seminara removed the weapon – a .40 caliber Smith & Wesson handgun – from Grant's waistband, and placed him under arrest. As Seminara removed the weapon from Grant's waistband, Grant explained to the officers that,

---

[2]The weapon offered in evidence at the hearing matched the shape described by Officer Seminara and was of such size as to be observable beneath clothing.

having heard the same shots they had heard, there was no way he was going to leave his residence without a weapon.

## DISCUSSION

The defendant's central argument, as set forth in his notice of motion, is that the discovery of the weapon at issue was the product of an unconstitutional seizure of Grant and that it should therefore be suppressed. The defendant concedes, as he must, that the police may constitutionally detain an individual briefly without a warrant if they have a reasonable suspicion, based on unusual conduct they have observed, "that criminal activity may be afoot." *E.g., Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Scopo*, 19 F.3d 777, 781 (2nd Cir. 1994). They also may "pat down" an individual whom they have stopped if they have a reasonable basis to conclude that the person is armed and thus dangerous. *Pennsylvania v. Mimms*, 434 U.S. 106, 111-12, 98 S.Ct. 330, 333-34 (1977). On the other hand, not all encounters with the public initiated by the police require a showing of reasonable suspicion to be found lawful. *See, e.g., United States v. Stone*, 73 F. Supp. 2d 441, 445 (S.D.N.Y. 1999) (citing *United States v. Hooper*, 935 F.2d 484, 490 (2nd Cir.1991)). "Consensual encounters require no justification so long as the police do not convey a message that compliance with their requests is required." *United States v. Tehrani*, 49 F.3d 54, 58 (2nd Cir. 1995) (citing *United States v. Glover*, 957 F.2d 1004, 1008 (2nd Cir.1992) (internal quotation marks omitted).

Applying the above principles, the court concludes that the police officers here acted lawfully and within the bounds of the constitution during their encounter with the defendant. As they approached Grant in the courtyard, they knew criminal activity had likely occurred given the gunshots they had heard. Once Seminara saw Grant adjust the bulge in his waistband to the

right side of his body, the police had ample reason to believe, not only that he was armed, but that he was in some way connected to the gunshots they had heard.  By that time, Seminara had already observed Grant from the roof acting in a furtive manner, peering around buildings, shortly after the gunshots, and had seen him clutching at a bulge in his waistband.  When Grant saw Seminara in the courtyard, he sought to avoid Seminara and the other officers by stepping back and turning to engage the kids at the benches in conversation.  When Grant adjusted the bulge in the courtyard, Seminara could see the outline of a gun – a horizontal piece attached to a vertical piece – moving under Grant's clothing.  That combination of facts provided reasonable suspicion that Grant was armed and involved in some kind of criminal activity.

Although the court concludes that the officers had reasonable suspicion sufficient to justify a *Terry* stop of the defendant when Seminara approached him and asked whether he had heard the gunshots, the court does not conclude that a *Terry* stop had yet occurred.  At that point, the encounter was consensual since there is no evidence that the police acted in a manner indicating that Grant was required to do anything.  It was only when Grant reacted nervously and made a move toward the bulge that Seminara asserted his authority by reaching for the weapon first, thus converting the encounter into a *Terry* stop.  At that point, Seminara had a reasonable basis for his intrusion on the defendant's fourth amendment rights.

The Supreme Court's decision in *Pennsylvania v. Mimms*, 434 U.S. 106, 98 S.Ct. 330 (1977), is instructive.  There, two police officers had conducted a routine traffic stop and asked the driver to step out of his automobile.  As he did so, one of the officers noticed a large bulge under the driver's sports jacket.  Concerned that the bulge might be a weapon, the officer frisked him and found a handgun in the driver's waistband.  The court had little difficulty concluding

that the bulge alone provided sufficient reason for conducting a limited search for weapons. *Id*., 434 U.S. at 111-12. The situation there was somewhat different from the situation here in that the officer had already legitimately stopped the driver for a traffic violation. But that difference is of no moment. As discussed above, Officer Seminara was acting entirely legitimately in approaching the defendant here and asking a question. He needed no justification for that approach. Given all that he had observed to that point he had a strong basis for concluding that the defendant was armed and therefore dangerous. Thus, when the defendant made what appeared to be a move toward the weapon, Seminara's reach for the weapon was entirely justified. As the Court in *Mimms* articulated, "The touchstone of our analysis under the Fourth Amendment is always the 'reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' " *Id*., 434 U.S. at 108-09 (quoting *Terry v. Ohio*, 392 U.S. at 19). Thus, as in *Mimms*, the inquiry must be "whether the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate." *Id*., 434 U.S. at 112 (internal quotation marks omitted). Here, as in *Mimms*, applying that standard leads ineluctably to the conclusion that "any man of 'reasonable caution' would likely have conducted the 'pat down.' " *Id*.

The defendant's memorandum catalogues several cases which he reads to suggest that a bulge alone is not enough to support a stop and frisk. *See United States v. Stone*, 73 F. Supp. 2d at 446; *United States v. Berry*, No. 04-CR-798, 2005 W L 189706, at *4 (E.D.N.Y. Jan. 19, 2005); *United States v. Manuel*, 64 Fed. Appx. 823, 826-27, 2003 WL 21105366, at *3 (2nd Cir. May 15, 2003) (summary order); *see also United States v. Baker*, 78 F.3d 135, 137 (4th Cir. 1996); *United States v. Roggeman*, 279 F.3d 573, 579 (8th Cir. 2002). In each of those cases,

however, the courts found that the stop and frisks were justified because, in addition to the presence of a bulge, the officers had other information that gave rise to reasonable suspicion that each of the defendants was armed. Here, too, Seminara had considerable information other than the bulge to justify his conclusion that the defendant was armed. For one thing, the bulge here was not just an undefined heavy object; the distinct shape of a handgun could be made out beneath the defendant's T-shirt and shorts. More importantly, Seminara had heard gunshots a short time earlier, had observed the defendant's furtive movements from the roof, had seen the defendant clutching the object at his waistband on several occasions, and had observed the defendant's reaction in shifting the weapon under his clothes and turning away from Seminara and towards the kids in the courtyard once the defendant observed the officer approaching him. Although each of these facts alone perhaps would not justify the officer's intrusion, collectively they constitute more than enough information in addition to the bulge to warrant the stop and frisk here.

## CONCLUSION

For the foregoing reasons, I recommend that the defendant's motion to suppress evidence be denied.

\*      \*      \*      \*      \*      \*

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(2); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985); *IUE AFL-CIO*

*Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2nd Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2nd Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Secretary of Health and Human Serv.*, 892 F.2d 15, 16 (2nd Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
February 13, 2008